IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Plaintiff, ) | No. CR 07-1922-FRZ-CRP |
| ) vs. ) | |
| ) | REPORT AND |
| ) | RECOMMENDATION |
| TIFFANY LAPUH, et. al., ) | |
| ) Defendants. ) | |
| _____ ) | |

Pending before the Court are Defendants' Motions to Suppress Evidence. (Docs 45, 48, 53). The Government responded to all three Motions and Defendant Hodges filed a Reply. (Docs 56, 63). This Court held extensive evidentiary hearings on the Motions over the course of two days, on May 22, 2008 and June 19, 2008. (Docs 66, 81). It is the Report and Recommendation of this Court that the District Judge, after his independent review and analysis, DENY Defendant Tiffany Lapuh's Motion to Suppress (Doc 53) and GRANT Defendants Jose Luis Aispuro-Beltran and Richard Alan Hodges' Motions to Suppress (Docs 45, 48).

In their Motions to Suppress, Defendants collectively challenge the validity of the stops that Border Patrol initiated on the two vehicles involved in this case. Defendants argue Border Patrol agents lacked the requisite reasonable suspicion to conduct a stop of either vehicle. All three Defendants seek to suppress the evidence that was found in the individual vehicle in which they were either a driver or passenger.[1]

---

[1] The Government argues in its Response that Defendants Hodges and Aispuro-Beltran, the driver and passenger of the Chevrolet Silverado respectively, do not have standing to contest the stop of Defendant Lapuh's vehicle, the Suzuki Reno. (Doc 56, p 8). Likewise, the Government argues Defendant Lapuh lacks standing to contest the stop of the

**Factual Findings**

The Court bases its factual findings on the testimony of the four witnesses presented in the evidentiary hearings. At the hearings, the Government presented the testimony of two Border Patrol agents. Border Patrol Agent Joseph Sorrento stopped the Suzuki Reno ("Suzuki") and he was the primary agent involved in this investigation. Border Patrol Agent Adrian Chaidez stopped the Chevrolet Silverado ("Silverado") after receiving a radio relay about the vehicle. The Defense called Investigator Downer to testify about the conditions and speed limits on Arivaca Road East ("Arivaca Road"), the location where most of the events in this case transpired. The Defense also called Defendant Tiffany Lapuh, driver of the Suzuki, to testify.

Agent Sorrento testified first. The Court found he was a credible though relatively inexperienced agent. He has two years experience as a Border Patrol agent and no other law enforcement experience. (May 22 Hearing, p 49). He has lived in Arizona for a year and a half, working at the Tucson Border Patrol Station. (May 22 Hearing, p 49). He estimated about half of his time at the Tucson Station he has worked in the Arivaca area. (May 22 Hearing, p 50-51).

On October 21st, 2007, Agent Sorrento was patrolling Arivaca Road as part of "Operation Denial," an operation Agent Sorrento described as focused on apprehending vehicles used for smuggling illegal narcotics or aliens. (May 22, 2008 Evidentiary Hearing, Transcript ("May 22 Hearing") p 14). For Operation Denial six Border Patrol agents covered a distance of approximately 25 miles along Arivaca Road, spanning the road from the town of Arivaca to Interstate 19. (May 22 Hearings, p 59). While working as part of Operation Denial, Agent Sorrento encountered the Silverado as it was traveling west on Arivaca Road and he was traveling in the opposite direction, east. Agent Sorrento noticed the Silverado because it "[i]t was a brand new Chevy pickup truck ..." (May 22 Hearing, p 18). In Agent

---

Chevrolet Silverado. It appears Defendants argue only for suppression of the evidence discovered in the vehicle in which they were either the driver or passenger. The Court finds defendants in this case asserted a privacy interest only in the vehicle in which they were the driver or passenger. *See United States v. Perez*, 644 F.2d 1299 (9th Cir.1981).

- 2 -

1   Sorrento's opinion, the Silverado seemed suspicious because there was "not a abundance of
2   brand new vehicles in Arivaca" given the isolation and economic depression of the area.
3   (May 22 Hearing, p 19). Agent Sorrento did not follow the Silverado at the time because he
4   was responding to another Operation Denial call. (May 22 Hearing, p 18).

5       About 25 minutes later, Agent Sorrento again observed the Silverado. This time it
6   was headed east on Arivaca Road with a passenger. (May 22 Hearing, p 24). At the time
7   Agent Sorrento was observing traffic while parked off road around mile post 8.5. (May 22
8   Hearing, p 29). Agent Sorrento's Border Patrol vehicle was perpendicular to the road. (May
9   22 Hearing, p 24, 65).

10      Agent Sorrento quickly determined to follow the Silverado because based on his two
11  years of training and experience, the short turnaround of the Silverado heading westbound
12  on Arivaca Road and then 25 minutes later heading eastbound was consistent with smuggling
13  of either illegal narcotics or aliens. (May 22 Hearing, p 27). As the Silverado passed him,
14  Agent Sorrento pulled onto the road behind the Silverado to follow it. (May 22 Hearing, p
15  24). On cross-examination, Agent Sorrento estimated it took him three or four seconds to
16  enter the road and travel behind the Silverado. (May 22 Hearing, p 66). Agent Sorrento
17  caught up to the Silverado "very fast" because he was "driving a sedan, one of the new
18  Chargers, and [he] accelerated up to the truck rapidly." (May 22 Hearing, p 69). Agent
19  Sorrento did agree on cross-examination that there are many reasons a person may be in a
20  location for only a short period of time that do not relate to smuggling aliens or drugs. (May
21  22 Hearing, p 117). Agent Sorrento followed the Silverado for a short time. While following
22  it, he noticed the Silverado was traveling consistently at 40 mph. Agent Sorrento believed
23  at the time that the speed limit in that area was 45 mph and that the Silverado's slow speed
24  was suspicious. (May 22 Hearing, p 29). Agent Sorrento, however, also described the area
25  as "very hilly, many turns, very desolate, very few houses." (May 22 Hearing, p 29). On
26  cross-examination, Agent Sorrento further described the road as "hilly and windy . . . a very
27  windy road." (May 22 Hearing, p 47).

28      While following the Silverado, Agent Sorrento noticed that a second vehicle,

1  Defendant Lapuh's Suzuki, was traveling behind him. (May 22 Hearing, p 24). He testified
2  the Suzuki was traveling approximately 300 yards behind the Silverado. (May 22 Hearing,
3  p 25). On cross-examination, Agent Sorrento testified that his Border Patrol vehicle was
4  approximately ten to fifteen car lengths behind the Silverado and Agent Sorrento was
5  between the Silverado and Suzuki. (May 22 Hearing, p 70). Agent Sorrento did not initially
6  notice the Suzuki because the Silverado and Suzuki were traveling far enough apart that
7  Agent Sorrento was able to go from a static position to pull out directly behind the Silverado
8  without noticing the Suzuki until he was traveling between the two vehicles. Nevertheless,
9  Agent Sorrento characterized the Silverado and Suzuki as traveling in close proximity. (May
10 22 Hearing, p 30).

11 After traveling with the Silverado and Suzuki for two and a half miles, Agent Sorrento
12 determined they were driving in tandem. (May 22 Hearing, pp 29, 119-120) (Agent Sorrento
13 begins to follow the Silverado around mile post 8.5 and makes his determination of driving
14 in tandem by mile post 11). He relied upon a couple of facts to make this determination.
15 First, although the Suzuki was approximately 3 football fields behind the Silverado, Agent
16 Sorrento believed they were in relative close proximity to each other given that traffic on
17 Arivaca Road that morning was light. Agent Sorrento testified the two vehicles "were the
18 only two vehicles that I had seen driving anywhere near in close proximity the whole
19 morning." (May 22 Hearing, p 30). Agent Sorrento agreed on cross-examination that he
20 believed the vehicles were driving in tandem because they were newer model vehicles with
21 temporary registration tags, the traveling in relative close proximity, and traveling at what
22 Agent Sorrento believed at the time to be a rate of speed below the speed limit. (May 22
23 Hearing, p 120).

24 As Agent Sorrento continued to follow the Silverado, he believed the Suzuki driver
25 began to distance herself from his Border Patrol vehicle. (May 22 Hearing, p 29). On cross-
26 examination, Agent Sorrento testified that the area where he observed the Suzuki begin to
27 fall behind was very hilly and that he did lose sight of the Suzuki on the turns. (May 22
28 Hearing, p 72, 73). Agent Sorrento also admitted that the Suzuki could have been traveling

- 4 -

1  at 35 mph during that time, which would have been consistent with the changing speed limits
2  to account for the windy road. (May 22 Hearing, p 77).

3        Based on his belief that the vehicles were traveling in tandem and that the driver of
4  the Suzuki was slowing down, Agent Sorrento pulled over so that the Suzuki could pass his
5  vehicle and he could observe the driver of that vehicle. (May 22 Hearing, p 31). As the
6  Suzuki passed, Agent Sorrento testified the single female occupant, the driver, appeared
7  rigid, statute like, with her hands at 10:00 and 2:00 on the steering wheel. (May 22 Hearing,
8  p 31). Agent Sorrento also noticed she did not "acknowledge [his] existence . . ." and that
9  the back windows of the Suzuki were tinted. (May 22 Hearing, p 32). As he pulled in
10 behind the Suzuki, he noticed that like the Silverado, it had a temporary registration tag.
11 (May 22 Hearing, p 33). After running the tag through his Tucson Radio for more
12 information, he discovered the Suzuki was registered to a person in Indian Wells, Arizona,
13 which Officer Sorrento learned was near Flagstaff, Arizona. (May 22 Hearing, p 35). Agent
14 Sorrento considered it "out of place" that a vehicle with tags for a town in northern Arizona
15 would be traveling on Arivaca Road in southern Arizona. (May 22 Hearing, p 36). From
16 Agent Sorrento's limited experience, he believed vehicles with temporary tags in newer
17 condition were consistent with illegal narcotics or alien smuggling. (May 22 Hearing, p 37).
18 Although, on cross-examination, Agent Sorrento did agree vehicles with regular license
19 plates are frequently used in smuggling as well. (May 22 Hearing, p 118).

20       As Agent Sorrento followed the Suzuki and ran its tag, he noticed that the Silverado
21 came back into his view. Agent Sorrento testified he believed this was further proof that the
22 Suzuki and Silverado were traveling in tandem because his patrol car and the Suzuki were
23 traveling under 40 mph, which in his opinion meant the Silverado was also traveling below
24 the speed limit in an effort to reduce the gap between all the vehicles. (May 22 Hearing, p
25 39-40). On cross-examination, Defense counsel made Agent Sorrento aware that in fact that
26 speed limit in that area of Arivaca Road East fluctuates between 35 mph, 40 mph, or 45 mph
27 with the curves and hills. (May 22 Hearing, p 75).

28       On cross-examination, Agent Sorrento testified that he followed the Suzuki for

1  approximately seven miles between milepost 10 and milepost 17 before he decided to
2  conduct a stop of the Suzuki. (May 22 Hearing, p 43, 94-95). After initiating the stop with
3  his lights and siren, Agent Sorrento testified that the driver of the Suzuki, Defendant Lapuh,
4  failed to yield for two miles. (May 22 Hearing, p 43). On cross-examination, Defense
5  counsel attempted to argue that Defendant Lapuh could not see or hear the lights or siren
6  from Agent Sorrento's vehicle because he was traveling approximately eight to ten car
7  lengths behind her at the time. (May 22 Hearing, p 99). This point, however, is inconsistent
8  with Agent Sorrento's testimony that he had to speed up significantly, to 60 mph, to keep
9  pace with the Suzuki. (May 22 Hearing, pp 43, 49). On re-direct, Agent Sorrento also
10 testified that he called out on the radio that the Suzuki failed to yield. (May 22 Hearing, p
11 146). Furthermore, on cross-examination, Defendant Lapuh also admitted to speeding up
12 after Agent Sorrento initiated the stop in an attempt to catch the Silverado. (May 22 Hearing,
13 p ). Defense counsel also attempted to argue that between milepost 17 and milepost 19, there
14 was not a safe place for Defendant Lapuh to pull over her vehicle. (May 22 Hearing, p 105-
15 106). This argument is inconsequential because Defendant Lapuh testified that she in fact
16 sped up during those two miles and was not looking for a place to pull over.

17      At some point in the two mile chase, the Silverado, which was in front of both the
18 Suzuki and Border Patrol car, pulled over to let the cars pass. (May 22 Hearing, p 138). The
19 Suzuki passed the Silverado "approximately midway through the two mile stretch." (May
20 22 Hearing, p 138). On cross-examination, Agent Sorrento agreed with Defense counsel that
21 the Silverado acted as a typical vehicle would by pulling over to the side of the road to let
22 the Suzuki and the Border Patrol vehicle pursuing the Suzuki pass. (May 22 Hearing, p 139.

23      After Agent Sorrento pulled over the Suzuki, he observed bundles or packages in the
24 backseat and smelled marijuana. (May 22 Hearing, p 45). Agent Sorrento placed Defendant
25 Lapuh under arrest and then relayed on his radio that he had pulled over a vehicle carrying
26 marijuana and that "there was a second vehicle driving in tandem with that – with that car
27 . . ." and that vehicle was traveling eastbound on Arivaca Road from mile post 19. (May 22,
28 p 46). Agent Sorrento described the second vehicle as a white Chevy Silverado with

1 temporary tags and two male occupants. (May 22 Hearing, p 46, 122).

2 In the evidentiary hearing, after the testimony of Agent Sorrento, the Government next
3 called Agent Adrian Chaidez. Agent Chaidez has worked with Border Patrol for six and a
4 half years. He has worked in the area of Arivaca Road for approximately five years. (May
5 22 Hearing, p 152). The Court found Agent Chaidez's testimony failed to add anything to
6 the observations of Agent Sorrento as a basis for the stop of the Silverado.

7 On October 21, 2007, Agent Chaidez was working the frontage road that parallels
8 Interstate 19 ("I-19"). Agent Chaidez was one of the Border Patrol agents assigned to
9 Operation Denial that day. Agent Chaidez was the Border Patrol agent who conducted the
10 stop of the Silverado. While Agent Sorrento was sending out the information across the
11 radio about the Silverado, Agent Chaidez was on the frontage road that parallels I-19,
12 approximately five to eight miles from the intersection where Arivaca Road runs into the I-
13 19. (May 22 Hearing, p 153). After Agent Chaidez heard the description of the newer white
14 Chevrolet Silverado, traveling eastbound with two male occupants on Arivaca Road toward
15 the I-19, Agent Chaidez began looking for the Silverado along the I-19. (May 22 Hearing,
16 p 153). At that point, Agent Chaidez observed a vehicle he believed to be the Silverado in
17 question approaching the Canoa exit. (May 22 Hearing, pp 153, 183). It was traveling
18 northbound on I-19 and passing vehicles, which Agent Chaidez interpreted to mean it was
19 traveling at a high rate of speed in excess of 75 mph. (May 22 Hearing, p 155). When Agent
20 Chaidez observed the vehicle, he was still on the frontage road, on the west side of the I-19,
21 meaning he was on the frontage road traveling southbound in the opposite direction of the
22 Silverado. (May 22 Hearing, p 165). Thus, he viewed the Silverado across two lanes of
23 southbound traffic and at least one lane of northbound traffic. (May 22 Hearing, p 165).

24 After observing the Silverado, he decided to pursue it. He initially pursued the
25 Silverado because it was a newer model truck traveling on the I-19 around the time a truck
26 traveling from Arivaca Road would have entered the interstate. (May 22 Hearing, p 168).
27 In order to follow the Silverado, Agent Chaidez continued traveling in the opposite direction
28 along the frontage road until he reached the next exit, which was Canoa. He then crossed

1  through the underpass and entered the I-19 now traveling northbound. (May 22 Hearing, p
2  169). On cross-examination, Agent Chaidez estimated he was a half a mile to three-quarters
3  of a mile behind the Silverado when he entered the I-19. (May 22 Hearing, p 184). Agent
4  Chaidez estimated that once on the I-19 it took him approximately two to three minutes to
5  catch up to the Silverado. (May 22 Hearing, p 169). Agent Chaidez, on cross-examination,
6  could not recall how fast he was traveling but he did say he "was going well above the posted
7  speed limit [75 mph] to try to catch up to the vehicle." (May 22 Hearing, p 170). On cross-
8  examination, Agent Chaidez also testified he had to pass several vehicles to catch up to the
9  Silverado, although he could not be sure if he was weaving in and out of traffic. (May 22
10 Hearing, p 170).

11 After traveling well above 75 mph to catch up to the Silverado, Agent Chaidez
12 observed behavior he found suspicious. He saw only one occupant, the driver. (May 22
13 Hearing, p 157). He testified this was suspicious to him because the radio transmission
14 identified a white Chevrolet with two occupants. He noted temporary tags on the Silverado,
15 but like Agent Sorrento, he could not read the tag. (May 22 Hearing, p 157). He also noticed
16 that the driver of the Silverado "was making a lot of movements" which led Agent Chaidez
17 to believe "that [the movement] was somewhat odd, maybe hiding something ..." (May 22
18 Hearing, p 158). He also testified that he believed the Silverado was traveling significantly
19 below the speed limit, around 45 mph, but admitted on cross-examination that he has no way
20 of gauging speed and that the speed limit in that area slows from 75 mph, to 65 mph, to 55
21 mph as vehicles approach the town of Green Valley. (May 22 Hearing, p 174). Agent
22 Chaidez also admitted on cross-examination that he does not know whether the speed limit
23 is 65 mph or 55 mph at the Continental Road exit. (May 22 Hearing, p 186). Also, Agent
24 Chaidez admitted that it may have only been two minutes that he followed the Silverado
25 before it exited on the Continental Road exit. (May 22 Hearing, p 185). Agent Chaidez also
26 agreed on cross-examination that deceleration occurs when a vehicle exits the interstate.
27 (May 22 Hearing, p 187). Based on his own observations, Agent Chaidez stopped the
28 Silverado. (May 22 Hearing, p 160).

1          After Agent Chaidez testified, Defendants presented the testimony of Investigator
2   Randolph Downer and Defendant Lapuh.  Investigator Downer testified first.  For the past
3   fifteen years, Investigator Downer has owned a private investigative business in Tucson.
4   (May 22 Hearing, p 204).  Prior to owning his own business, he worked as a criminal
5   investigator specialist for the county public defender's office. (May 22 Hearing, p 204). For
6   this case, Investigator Downer investigated the relevant portion of Arivaca Road.  He
7   observed the posted speed limits between milepost 6 and the I-19 and videotaped those speed
8   limit signs as well as the topography of the road.  (May 22 Hearing, p 205).  A videotape of
9   Arivaca road between milepost 6 and the I-19 was provided to the Court.  (May 22 Hearing,
10  p 205).  The court found Investigator Downer was a credible witness who provided helpful
11  information about the speeds traveled on Arivaca Road as well as its topography.

12         Investigator Downer testified that the speed limit on Arivaca Road fluctuates and he
13  provided the Court with specific speed limits at given mileposts along the road.  (May 22
14  Hearing, p 207).  When Agent Sorrento would have pulled out after the Silverado around
15  milepost 8.5, the speed limit is 40 mph and then drops to 35 mph before it increases to 45
16  mph around milepost 9.  (May 22 Hearing, p 207).  The speed limit drops again around
17  milepost 12, down to 40 mph.  (May 22 Hearing, p 208).  Between milepost 15 through
18  milepost 18, the speed limit flucuates from 40 mph, 45 mph, 35 mph, and then back to 45
19  mph.  (May 22 Hearing, p 209).  Significant to Defendant Lapuh's Motion, Investigator
20  Downer admitted on cross-examination that he never saw a speed limit sign on Arivaca Road
21  East that indicated 60 mph.  (May 22 Hearing, p 226).

22         Investigator Downer testified that it would be difficult for someone driving along
23  Arivaca Road to maintain visual contact with a vehicle that was 8 to 10 car lengths behind
24  or in front of the driver's vehicle because there are blind turns, inclines and declines.  (May
25  22 Hearing, p 212).  Investigator Downer also observed significant signage on Arivaca Road.
26  In addition to the multiple speed limit signs, there are signs warning drivers to watch for deer
27  and cattle guard warnings.  (May 22 Hearing, p 224).

28         The Government contested Investigator Downer's observations of the changing speed

1    limits. It argued the speed limit on the relevant section of Arivaca Road is 45 mph. It
2    conceded there are posted signs indicating slower speeds, but the Government argued those
3    signs only suggest cautionary speed limits around curves or hills. (June 19 Hearing, p 15-
4    21).

5            Defense counsel next called Defendant Tiffany Lapuh. (June 19 Hearing, p 27).
6    Defendant Lapuh testified as to her recollection of the events on October 21, 2007, when
7    Agent Sorrento followed the Silverado and then her Suzuki before initiating a stop of her
8    vehicle. The Court found Defendant Lapuh presented some credible evidence but
9    contradicted herself on key issues in her direct and cross-examination. Defendant Lapuh
10   disputed that she slowed the speed of her vehicle when Agent Sorrento began following the
11   Silverado. She stated she was not traveling below the speed limit but rather was following
12   the speed limit signs she saw posted. (June 19 Hearing, p 29-30). She also stated she did not
13   have her hands on the steering wheel of the car at the 10 and 2 position because she had a
14   cigarette in her left hand and she was steering with her right hand. (June 19 Hearing, p 34-
15   35). She also disputed that Agent Sorrento used his siren to pursue her, testifying that she
16   only saw the lights of his vehicle. (June 19 Hearing, p 35-36). The Court need not resolve
17   the dispute among these facts because they are not critical to determine whether Agent
18   Sorrento had reasonable suspicion to stop the Suzuki.

19           The critical issue for Defendant Lapuh's Motion is whether she accelerated after
20   Agent Sorrento initiated the stop of her vehicle. Defendant Lapuh said she failed to pull over
21   after she saw Agent Sorrento's lights for about 30 seconds. (June 19 Hearing, p 36). Agent
22   Sorrento testified that it took her two minutes to pull over her vehicle. (June 19 Hearing, p
23   36). Agent Sorrento testified he called for back up because Defendant Lapuh failed to yield,
24   so it seems she failed to yield longer than 30 seconds. On cross-examination, Defendant
25   Lapuh agreed that there were places to pull over her vehicle between milepost 17 and
26   milepost 19 and that she was nervous that day because she was transporting marijuana. (June
27   19 Hearing, p 40). She also agreed on cross-examination that while she testified that Agent
28   Sorrento did not initiate his siren to pull her over, she was always aware that he was behind

her. (June 19 Hearing, p 41). In her direct testimony, Defendant Lapuh testified that she did not accelerate to 60 mph. (June 19 Hearing, p 36-37). On cross-examination, however, Defendant Lapuh agreed that when interviewed by agents she told them that she did not stop immediately after Agent Sorrento initiated the stop because she wanted to catch up to the driver of the Silverado so he would know she was being stopped. (June 19 Hearing, p 42). She also testified on cross-examination that she attempted to catch up to the Silverado after she saw that Agent Sorrento was following her with his emergency equipment activated. (June 19 Hearing, p 42). At the time Agent Sorrento initiated a stop of her Suzuki, Defendant Lapuh testified that the Silverado, which was traveling in front of her, was not in her field of vision. (June 19 Hearing, p 46). Defendant Lapuh accelerated her speed, so that the Silverado driver could see that she was being pulled over. (June 19 Hearing, p 46). In aggregate, this testimony shows Defendant Lapuh failed to yield to Agent Sorrento's efforts to initiate a stop of her vehicle.

**Standard for Review**

The Fourth Amendment prohibits an officer from stopping a vehicle without a reasonable or founded suspicion of criminal conduct at the time of the stop. *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992). Reasonable suspicion exists when an officer is aware of specific, articulable facts, which together with objective and reasonable inferences, form a basis for suspecting that the particular person to be detained has committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 393, 394 (9th Cir.1991). The determination whether reasonable suspicion exists must be based on "the totality of the circumstances - the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The facts are to be interpreted in light of a trained officer's experience, and the whole picture must be taken into account. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

In a motion to suppress the Government has the burden of production to put forward the "specific and articulable facts." *United States v. Willis*, 431 F.3d 709, 715 n. 5 (9th Cir.2005) (quotations omitted). The defendant has the burden of proof on the motion to suppress. *Id.*

**The Stop of Defendant Lapuh's Suzuki**

The Government argues Agent Sorrento had reasonable suspicion to stop Defendant Lapuh's Suzuki. To support reasonable suspicion, the Government notes (1) Arivaca Road is a known route for smuggling illegal narcotics and aliens; (2) Defendant Lapuh appeared rigid and nervous when she passed Agent Sorrento's vehicle; (3) Defendant Lapuh was driving a newer vehicle with temporary registration tags, registered in northern Arizona; (4) Agent Sorrento believed the Silverado and Suzuki were traveling in tandem; and (5) when Agent Sorrento initiated the stop of Defendant Lapuh's Suzuki, she increased her speed to 60 mph before yielding.

Defense counsel argues none of the factors cited by the Government or the aggregate of those factors supports reasonable suspicion.

This Court finds the fact that Defendant Lapuh accelerated her vehicle in an attempt to catch up to the Silverado after Agent Sorrento initiated the stop compelling.

Reasonable suspicion necessary for the stop of a vehicle can be based on events that occur during a chase by border patrol agents once an agent has initiated a stop of the vehicle. *United States v. Santamaria-Hernandez*, 968 F.2d 980 (9th Cir.1992). In *Santamaria*, After the Border Patrol agent initiated the stop, the driver of defendants' vehicle accelerated from 50-55 mph up to 70-80 mph and three heads of people hiding in the vehicle popped up in the back seat of the vehicle. *Id*., 968 F.2d at 982. The District Court in that case found reasonable suspicion lacking because such suspicion was not developed prior to the agent initiating a stop of the vehicle. The Ninth Circuit reversed the District Court, holding that reasonable suspicion could be developed until an actual seizure of the vehicle occurred, which would not happen until the vehicle yielded to the agent initiating the stop. *Id*. Thus, the actions of the driver in accelerating and failing to yield to the agent initiating the stop gave the agent sufficient reasonable suspicion to stop the vehicle. *Id*. at 982-983.

The Ninth Circuit based its decision on the Supreme Court's reasoning in *California v. Hodari D.*, 499 U.S. 621 (1991). In *Hodari*, the defendant who was fleeing from law enforcement when he tossed away a rock of cocaine was not "seized" in terms of the Fourth

Amendment until law enforcement tackled and handcuffed him. Thus, the rock cocaine that defendant tossed away when he was fleeing from law enforcement was not suppressed because defendant had not yet been seized and the Fourth Amendment did not apply. *Id.*, 499 U.S. at 626. The Supreme Court ruled that a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject. *Id.*

In *Santamaria*, the Ninth Circuit analogized a defendant fleeing on foot to a defendant fleeing in his car. A defendant fleeing in his vehicle is the same as a defendant fleeing on foot and is therefore not "seized" for Fourth Amendment purposes until he is physically apprehended by law enforcement at the end of a chase. "The determination whether agents have founded suspicion to justify a stop may take into account all of the events that occur up to the time of physical apprehension of a suspect who flees." *Santamaria*, 968 F.2d at 983.

In the case before this Court, Agent Sorrento likely lacked reasonable suspicion when he initiated a stop of Defendant Lapuh's Suzuki. The first three facts cited by the Government are all generic in nature and provide little evidence that a particular person, Defendant Lapuh, had committed or was about to commit a crime. The fourth fact, Agent Sorrento's belief that the vehicles were traveling in tandem is based on little evidence and controverted by Defendants' witnesses. This fact is analyzed in detail in the section of this Report and Recommendation addressing the stop of the Silverado.

While Agent Sorrento likely lacked reasonable suspicion when he initiated the stop of the Suzuki, he developed it in the time Defendant Lapuh failed to yield. Defendant Lapuh admits increasing her vehicle's speed after she saw Agent Sorrento initiate the stop because she wanted to catch up to the Silverado. There are some factual disputes as to whether Agent Sorrento activated his siren in addition to his lights, whether Defendant Lapuh could have pulled over in the two miles where she failed to yield, how fast she increased her speed to catch the Silverado, and how long she failed to yield. The disagreement with the testimony on these facts is inconsequential. Defendant Lapuh, by her own testimony, admits that she was keenly aware of Agent Sorrento traveling behind her vehicle because she was carrying

bundles of marijuana and did not want to be stopped. Whether Defendant Lapuh only saw Agent Sorrento's lights or both saw his lights and heard his siren, she knew that he intended to stop her vehicle. Rather than look for a place to pull over to the side of the road, Defendant Lapuh admits that she increased her speed on a hilly and windy road in order to catch up to the Silverado so the driver of the Silverado would know that she was being stopped by Border Patrol. Agent Sorrento testified that he was traveling at 60 mph to keep pace with Defendant Lapuh. The Suzuki was clearly traveling in excess of the 45 mph speed limit. This is exactly the failure to yield in response to a show of authority that *Hodari D.* and *Santamaria* address.

Defendant Lapuh's failure to yield is evidence that she is engaged in criminal activity and that failure to yield gave Agent Sorrento the requisite reasonable suspicion to stop her vehicle. This Court recommends that the District Judge, after his independent review and analysis, deny Defendant Lapuh's motion to suppress.

**The Stop of the Silverado**

The Government argues Agent Chaidez developed reasonable suspicion to stop the Silverado from his own observations as well as the observations of Agent Sorrento that the Government argues are imputed to Agent Chaidez. To support a finding of reasonable suspicion the Government argues (1) Arivaca Road is a known route for smuggling illegal narcotics and aliens; (2) the Silverado's quick 25 minute turnaround on Arivaca Road and addition of a passenger was consistent with smuggling of illegal narcotics or aliens; (3) the Silverado was a newer vehicle with temporary tags; (4) Agent Sorrento believed the Silverado and Suzuki were traveling in tandem; (5) Agent Chaidez believed the Silverado was speeding when he first observed it traveling on the I-19; (6) Agent Chaidez believed the driver appeared nervous, looking in the rearview mirror or window and making movements around the center console; and (7) the Silverado's decrease in speed as Agent Chaidez followed it.

Defense counsel argue Agent Chaidez lacked reasonable suspicion developed from his own observations or aggregated with Agent Sorrento's observations.

1   The Court acknowledges the first three facts cited by the Government but is
2 unconvinced that they support a finding of reasonable suspicion without other facts. While
3 it is true Arivaca Road is a known smuggling route, it is also a public highway traveled by
4 people not engaged in illegal activities. Likewise, the Silverado's quick turnaround in a
5 newer vehicle is not necessarily suspicious. Agent Sorrento testified that he noticed the
6 newer Silverado traveling west and then saw it 25 minutes later traveling east with a
7 passenger who was not visible the first time Agent Sorrento observed the Silverado. There
8 are many explanations for a vehicle to travel to Arivaca, pick up a passenger and travel back
9 toward the I-19 and larger cities. There are also many reasons people might be driving a
10 newer Silverado with temporary tags in that area. Perhaps the most compelling reason these
11 facts are not suspicious by themselves is that Agent Sorrento followed the Silverado based
12 on these facts for a few miles and did not develop, in his opinion, reasonable suspicion to
13 initiate a stop of the vehicle. During the time Agent Sorrento followed the Silverado, he
14 observed nothing unusual about it, the driver, or the passenger. It was not riding low, it was
15 not dusty and it was clean of debris that might have suggested it went off-road and the
16 occupants did not appear nervous.

17   Agent Sorrento noticed, instead, the Suzuki traveling behind him and believed it may
18 have been traveling in tandem with the Silverado. He, thus, pulled over so it could pass him
19 and he could follow it. Agent Sorrento believed the vehicles were traveling in tandem
20 because they were both newer vehicles and appeared to be accelerating and decelerating
21 together over the course of the eight and a half miles he followed the Suzuki.

22   The Ninth Circuit has held that driving in tandem must be based on more than the
23 "briefest of observations." *United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir.1989)
24 (following three vehicles for approximately one kilometer not sufficient to constitute driving
25 in tandem), overruled on other grounds in *United States v. Santamaria-Hernandez*, 968 F.2d
26 980 (9th Cir.1992). Cases in which courts have found driving in tandem to be a factor
27 supporting reasonable suspicion, the driving in tandem is significant and detailed. *See United*
28 *States v. Medina-Gasca*, 739 F.2d 1451, 1453 (9th cir.1984) (extended observation of three

1  vehicles traveling close together, parking bumper-to-bumper, and later traveling once again
2  in tandem); *United States v. Saenz*, 578 F.2d 643, 646-647 (5th cir.1978) (cars observed
3  traveling together for 70 miles), *cert. denied*, 439 U.S. 1075 (1979); *United States v.*
4  *Villarreal*, 565 F.2d 932, 936 (5th Cir.) (driving in tandem for approximately an hour), *cert.*
5  *denied*, 439 U.S. 824 (1978).

6        The Court is not convinced the vehicles could be linked as traveling in tandem based
7  on Agent Sorrento's observations. The fact that both vehicles were newer and had temporary
8  registration tags is somewhat suspicious but nothing else supports a conclusion of driving in
9  tandem. The acceleration and deceleration is not suspicious and actually reasonable given
10 the fluctuating speeds on that section of Arivaca Road. Defense counsel proved Arivaca
11 Road is a windy and hilly road with signs that at the very least caution speeds slower than
12 45 mph around curves and hills. Based on the evidence presented, the speed varies from 35
13 mph, 40 mph, and 45 mph and changes with frequency given the curves and hills of the road.
14 Also, Arivaca Road is a one lane road traveling toward the I-19. Thus, it is reasonable, not
15 suspicious, that the Suzuki would travel behind the Silverado, without passing it and that the
16 two vehicles, with Agent Sorrento's vehicle in between them as well, would decelerate and
17 accelerate based on the road signage suggesting slower speeds around curves and hills and
18 the topography of the road.

19       The Government also argues there was little traffic on Arivaca Road on the morning
20 of October 21, 2007, and it is therefore suspicious that the Silverado and Suzuki were
21 traveling in close proximity to each other. The Court is not convinced by this argument for
22 a few reasons. First, the vehicles were traveling far enough apart, approximately 3 football
23 fields in distance, that Agent Sorrento did not notice the Suzuki when he went from a static
24 position and pulled in between it and the Silverado. Second, it is reasonable, not suspicious,
25 that vehicles might travel in relative proximity to each other when it is a windy, hilly road
26 and the vehicle behind the first one may be unable or unwilling to pass the vehicle in front.
27 Finally, when Agent Sorrento initiated a stop of the Suzuki, the driver of the Silverado
28 behaved as most drivers would have by pulling his vehicle over and letting the Suzuki and

1  pursuing law enforcement officer pass.

2      The Court is not convinced Agent Sorrento had sufficient evidence to determine the
3  Silverado and Suzuki were driving in tandem.  Thus, the only facts observed by Agent
4  Sorrento were a newer vehicle with temporary registration tags traveling with a quick
5  turnaround on a road known as a smuggling route.  This is insufficient to establish reasonable
6  suspicion.  To find reasonable suspicion, Agent Chaidez must have observed other facts that
7  aggregate to a conclusion that the Defendants in the Silverado engaged in or were about to
8  engage in criminal activity.

9      As previously identified, Agent Chaidez relied on his personal observations that he
10 believed the Silverado was speeding when he first saw it, the driver appeared nervous when
11 Agent Chaidez caught up to him on the I-19, and the Silverado decreased in speed during the
12 couple minutes Agent Chaidez followed it on the I-19.  The Court addresses each of these
13 facts in the following paragraphs.

14     First, Agent Chaidez's conclusion that the Silverado was speeding on the I-19 is not
15 reliable.  Agent Chaidez reached that conclusion while traveling on the frontage road on the
16 opposite side of the interstate, in the opposite direction of the Silverado.  He also made that
17 observation by viewing the Silverado across a minimum three lanes of traffic.  Agent
18 Chaidez was not in a position to give a reliable observation about the speed or characterize
19 the driving of the Silverado.

20     Second, Agent Chaidez testified that the driver of the Silverado appeared nervous
21 because he was looking in his rearview mirror or window and making a lot of movements
22 in the center console.  These observations are not helpful because they were made after
23 Agent Chaidez traveled at a speed well above 75 mph to race up to the Silverado, drive next
24 to it and then get behind it.  It is not suspicious, but rather an expected reaction that a driver
25 would look in his rearview mirror or window and be making movements in his vehicle when
26 a law enforcement officer races up to his vehicle and is clearly inspecting him and the
27 vehicle.  Finally, it is not suspicious that the Silverado slowed its speed in the brief time
28 Agent Chaidez followed it before he initiated the stop.  The deceleration could have been a

1  reasonable response to Agent Chaidez's efforts to race up to the Silverado to catch it.
2  Furthermore, the speed limit was dropping on that section of the interstate as the vehicle
3  neared Continental Road. Also, the Silverado exited on Continental Road and likely slowed
4  down in order to complete a safe exit from the interstate.

5  Agent Chaidez did not have the requisite reasonable suspicion to stop the Silverado.
6  He made few observations on his own, most of which were unreliable given his remote
7  position from the Silverado and then the short time that he followed it before he initiated a
8  stop of it. Given that there was insufficient evidence to support Agent Sorrento's belief that
9  thte Silverado and Suzuki were driving in tandem, Agent Sorrento's observations imputed
10 to Agent Chaidez also do not equate to reasonable suspicion.

11 Officer Chaidez did not have the requisite reasonable suspicion to initiate a stop of the
12 Silverado. This Court recommends the District Judge, after his independent review and
13 analysis, GRANT the motions to suppress for Defendants Hodges and Aispuro-Beltran.

14 **Recommendation**

15 For the reasons outlined above, the Magistrate Judge recommends that the District
16 Judge after his independent review and analysis, DENY Defendant Lapuh's Motion to
17 Suppress. (Doc 53) and GRANT Defendant Hodges's Motion to Suppress (Doc 48) as well
18 as Defendant Aispuro-Beltran's Motion to Suppress (Doc 45).

19 Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within
20 ten days of being served with a copy of the Report and Recommendation. If objections are
21 not timely filed, they may be deemed waived. The parties are advised that any objections
22 filed are to be identified with the following case number: **cr-07-1922-FRZ**.

23 The Clerk is directed to mail a copy of the Report and Recommendation to Plaintiff
24 and counsel for Defendants.

25 DATED this 8th day of September, 2008.

26
27
28

_Charles R. Pyle_

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE